# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | James B. Moran | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 98 C 5133 | **DATE** | 7/31/2000 |
| **CASE TITLE** | United States of America vs. American National Can Co. | | |

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**MOTION:**

Memorandum Opinion and Order

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. ANC's motion for summary judgment is granted as to all five counts contained in the complaint. Furthermore, ANC's motion to strike and the government's motion for summary judgment are dismissed as moot.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | number of notices | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | | | |
| | Notices mailed by judge's staff. | | AUG 0 2 2000 | | |
| | Notified counsel by telephone. | | date docketed | | 47 |
| ✓ | Docketing to mail notices. | | S.B. | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | date mailed notice | | |
| WAH | courtroom deputy's initials | | | | |
| | | Date/time received in central Clerk's Office | | mailing deputy initials | |

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)
)
vs. ) No. 98 C 5133
)
AMERICAN NATIONAL CAN CO., )
)
Defendant. )

DOCKETED
AUG 0 2 2000

## MEMORANDUM OPINION AND ORDER

The government brings this action on behalf of the Environmental Protection Agency (EPA) against American National Can Company (ANC), alleging violations of the Clean Air Act (CAA), 42 U.S.C. § 7401, *et seq.*, and federal asbestos regulations, 40 C.F.R. § 61.140 *et seq.* The government claims that for a period of at least several months scavengers stripped and removed asbestos from pipes and other components in an effort to salvage metal at a vacant building owned by ANC. The government argues that this activity constituted a "renovation," as that term is defined by the asbestos regulations, triggering federally-mandated notice and work practice standards related to the handling of asbestos during renovation. The government claims that ANC failed to adhere to those requirements and therefore is strictly liable for civil penalties.

ANC has moved for summary judgment with respect to all five counts of the complaint. The government has filed its own motion for summary judgment, but briefing on that motion is not yet complete. We have advised the parties that we will resolve ANC's motion first and then proceed to accept further briefs on the government's motion, if necessary. For the reasons set forth below, we grant ANC's motion and therefore need not address the

government's motion.

## BACKGROUND

### I. Regulatory Framework

We begin with a brief summary of the federal regulations at play in this lawsuit. Section 112 of the CAA authorizes the EPA to publish a list of hazardous air pollutants and to establish national emission standards for each such pollutant. 42 U.S.C. § 7412. These standards are known as the National Emission Standards for Hazardous Air Pollutants (NESHAPs). Asbestos was one of the first pollutants designated as hazardous under the CAA and, in 1973, the EPA promulgated a NESHAP for asbestos. 38 Fed. Reg. 8820 (1973). The first iteration of the asbestos NESHAP included requirements and standards governing the removal or stripping of friable (*i.e.*, dry) asbestos materials prior to the demolition of a building. *Id.* In 1975, the asbestos NESHAP was expanded to govern the handling of asbestos during renovation in addition to demolition. 40 Fed. Reg. 48293 (1975). The asbestos NESHAP was amended and repromulgated in 1984 and again, most recently, in 1990. *See* 49 Fed. Reg. 13658 (1984); 55 Fed. Reg. 48406 (1990). The current form of the asbestos NESHAP is found at 40 C.F.R. § 61.140 *et seq.*

Specifically with respect to renovation, the asbestos NESHAP requires that owners provide prior notification and meet certain work practice standards when a jurisdictional amount of friable asbestos material is disturbed during renovation of a facility. 40 C.F.R. § 61.145. The current regulation defines "renovation" as follows:

> "Renovation" means altering a facility or one or more facility components in any way, including the stripping or removal of [asbestos] from a facility component. Operations in which load bearing structural members are wrecked or taken out are demolitions.

40 C.F.R. § 61.141. The asbestos NESHAP states that an owner must give prior notice to the EPA before undertaking a renovation. 40 C.F.R. § 61.145(b). Moreover, the asbestos NESHAP's work practice standards require that the owner remove friable asbestos from a facility before initiating any renovation activity that would disturb such materials, 40 C.F.R. § 61.145(c)(1), and further require that the owner adequately wet the asbestos during renovation and ensure that the asbestos remains wet until it is collected and removed from the facility. 40 C.F.R. § 61.145(c)(3), (c)(6)(i).

Failure to comply with the requirements set out in the asbestos NESHAP constitutes a violation of Section 112 of the CAA. 42 U.S.C. § 7412(i)(3)(A). Pursuant to Section 113 of the CAA, 42 U.S.C. § 7413(b), the EPA is authorized to seek civil penalties against an owner who has not complied with the asbestos NESHAP and fine that owner up to $25,000 per day for its infraction. These federal regulations animate the government's lawsuit against ANC: the government claims that ANC engaged in a renovation without complying with the work practice standards contained in the asbestos NESHAP and therefore is liable for civil penalties amounting to over $1.4 million.

## II. Factual Background

This regulatory backdrop sets the stage for the events that spawned this litigation. In March 1993, ANC decided to cease operations at a can manufacturing facility it owned in Chicago. The facility housed pipes and other components tainted with asbestos. ANC vacated the building in March 1993, and turned off alarm systems and water service to the building by August 1993. ANC intended to demolish the facility and in the meantime hired a security company to patrol the vacant building and its surrounding property. Despite the security,

unauthorized scavengers accessed the building and removed salvageable material. In the course of their salvage operations, the scavengers also disturbed friable asbestos materials contained in the building.

The EPA became aware of potential violations of the asbestos NESHAP at ANC's vacant building and sent an inspector to the facility in May 1994. The government alleges that the EPA inspector discovered substantial amounts of stripped and removed friable asbestos materials in the vacant building. On June 29, 1994, the EPA issued a proposed administrative order requiring ANC to secure the facility so that scavengers would not continue to access the building and disturb asbestos. On August 8, 1994, the EPA issued a final administrative order mandating that ANC comply with the asbestos NESHAP and secure its facility from scavengers. Immediately upon execution of the final order, ANC engaged an asbestos removal company to clean up the disturbed asbestos from its vacant building. This work was completed by August 19, 1994. According to the government, scavengers continued to access the facility and disturb asbestos after this date. ANC disputes this factual contention. ANC ultimately demolished the building in May 1995.

On August 19, 1998, the government filed a five-count complaint against ANC based on the above-described events. Counts I-III allege that ANC violated the CAA by renovating its facility without adhering to the asbestos NESHAP's work practice standards related to the handling of asbestos during renovation. Specifically, the government alleges that friable asbestos was not removed from the facility prior to the unauthorized scavenging (Count I), that the asbestos was not wetted while it was being disturbed by the scavengers (Count II), and that the asbestos disturbed by the scavengers was not kept wet until collected for disposal

(Count III). Count IV alleges that the notice of demolition issued by ANC prior to demolishing the facility in 1995 was deficient. Count V alleges that ANC violated the August 8, 1994, administrative order because scavengers continued to access the building and disturb asbestos after that order was issued. ANC moves for summary judgment with respect to Counts I-III, based on the straightforward argument that unauthorized scavenging does not constitute a renovation as that term is defined in the asbestos NESHAP. ANC challenges Count IV on the grounds that the notice of demolition was sufficient, and claims that Count V should be rejected because the EPA did not have the authority to issue the administrative order in the first place. We agree with ANC's assessment of the case.

## DISCUSSION

### I. Summary Judgment Standard

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986). In considering a motion for summary judgment a court must "construe all facts in the light most favorable to the non-moving party and draw all reasonable inferences in favor of that party." Skorup v. Modern Door Corp., 153 F.3d 512, 514 (7th Cir. 1998); see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). A genuine issue of material fact exists if there is sufficient evidence for a reasonable factfinder to decide the issue in favor of the non-moving party on the particular issue. Eiland v. Trinity Hosp., 150 F.3d 747, 750 (7th Cir. 1998). The "mere existence of some alleged factual dispute between the

parties," however, will not defeat summary judgment. <u>Anderson</u>, 477 U.S. at 247.

## II. <u>Renovation</u>

Counts I-III and, to some extent Count V, turn on whether the scavenging activity that occurred at ANC's facility constitutes a renovation, as that term is defined under the asbestos NESHAP.[1] The parties are at odds on this critical issue. Admitting that its position is a novel one, the government claims that the term "renovation" does, and always has, encompassed unauthorized scavenging. ANC relies on the language, regulatory history, and enforcement practice of the asbestos NESHAP to argue that the term "renovation" cannot be construed to include unauthorized scavenging. Thus, we face a question of regulatory interpretation.

We begin with a short review of the relevant legal principles. Generally, courts defer to an agency's construction of the statutory scheme it is charged to administer. <i>See</i> <u>Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.</u>, 467 U.S. 837, 844 (1984). When reviewing an agency's interpretations, <u>Chevron</u> instructs us to first determine whether Congress has spoken to the precise issue, and, if not (<i>i.e.</i>, if the statute is silent or ambiguous), to defer to the agency's construction so long as it is permissible under the statute. <u>Id.</u> at 842-43. The <u>Chevron</u> doctrine cements deference as the juridical foundation upon which we are

---

[1] In order to establish liability under the asbestos NESHAP, the government must prove that 1) ANC was an owner or operator of a facility, 2) a renovation occurred, 3) asbestos was removed or stripped without complying with the requirements and practices delineated in the asbestos NESHAP, and 4) a jurisdictional amount of asbestos was disturbed. 40 C.F.R. § 61.140 <i>et seq.</i> The first and third elements are not in contention. The parties are in dispute as to whether a jurisdictional amount of asbestos was disturbed, but we need not address this controversy since we hold that the government's case fails on element two.

to review an agency's interpretation of its organic statute.[2] Even greater deference is owed when an agency interprets its own regulations, as is the case here. In that context we are to accord substantial deference, upholding the agency's construction unless "it is plainly erroneous or inconsistent with the regulation." Thomas Jefferson University v. Shalala, 512 U.S. 504, 512 (1994) (internal quotation marks omitted); Udall v. Tallman, 380 U.S. 1, 16-17 (1965). Substantial deference, however, does not mean acquiescence. Green v. Shalala, 51 F.3d 96, 100 (7th Cir. 1995); Wisconsin Elec. Power Co. v. Reilly, 893 F.2d 901, 907 (7th Cir. 1990) (Chevron doctrine "does not give the EPA unbridled discretion to construe the [CAA] free from judicial oversight."). We will overturn an agency's interpretation if an "alternative reading is compelled by the regulation's plain language or by other indications of the Secretary's intent at the time of the regulation's promulgation." Thomas Jefferson, 512 U.S. at 512 (internal quotation marks omitted). Furthermore, no deference is due when an agency has not formulated an official interpretation but is merely advancing a litigation position. United States v. Trident Seafoods Corp., 60 F.3d 556, 559 (9th Cir. 1995); see Auer v. Robbins, 519 U.S. 452, 462 (1997). In sum, an agency's interpretation of its own regulation is usually, but not always, upheld.

We are presented here with one of those unusual cases in which an agency's interpretation of its own regulation cannot survive judicial review. The EPA construes the term "renovation" to include unauthorized scavenging. The overwhelming evidence related to the asbestos NESHAP indicates that the EPA is wrong. Our attempt to divine the meaning

---

[2]There are cracks in the pavement, but the Chevron doctrine remains solid. See Christensen v. Harris County, 120 S.Ct. 1655, 1662-63 (2000) (reaffirming Chevron but holding that less deference is owed an agency's informal interpretations of its organic statute).

of the term begins with the dictionary. As a verb, "renovate" is defined as follows: "to restore to a former better state (as by cleaning, repairing, or rebuilding)." Merriam-Webster's Collegiate Dictionary 991 (10th ed. 1993). Unauthorized scavenging clearly does not fit this definition, as it is quite the opposite of a restoration. All indications are that the drafters of the asbestos regulations also did not envisage scavenging to come within the meaning of "renovation." Added to the asbestos NESHAP in 1975, renovation was initially defined as the "removing or stripping of friable asbestos material." 40 Fed. Reg. at 48299. The EPA explained its reasons for adding renovation as a regulated activity in a background information document published in 1974 (1974 Background Document) (ANC Exh. 43). The EPA was concerned that "major renovation operations" that "potentially result in asbestos emissions of a magnitude similar to that from demolition" would go unregulated (*id.* at 12-13). The solution was expanding the NESHAP to cover renovations. The 1974 Background Document cites the "rebuilding of industrial plants" and the "replacement of apparatus" (*e.g.*, "replacement of a boiler in an apartment building"), as examples of the sort of activity the EPA was proposing to regulate as renovation (*id.* at 13, 113). The usage of these descriptive terms suggests that the EPA had major restoration work, not unauthorized scavenging, in mind when it drafted the regulations.

The asbestos NESHAP has been amended and revised since 1975. Each proposed and final amendment to the regulation has contained slight variations in the wording of the definition of "renovation." *See, e.g.*, 49 Fed. Reg. at 13661; 55 Fed. Reg. at 48416. The EPA has repeatedly emphasized, however, that the proposed and final changes were meant to clarify the regulations and not increase their stringency. *See* 49 Fed. Reg. at 13658; 55 Fed.

Reg. at 48406. Notably, in one proposed clarification of the term, the EPA defines "renovation" to mean "refurbishing." 48 Fed. Reg. 32126, 32129 (1983). This echoes the sentiments expressed in the 1974 Background Document. Like the framers of the original regulation, the drafters of successive iterations accepted the dictionary definition of "renovation" (*i.e.*, restoration to a former better state) as the understood meaning of the term. Even EPA personnel, when asked during their depositions, used words like "reconstruction," "remodeling," and "restorative" to describe the term "renovation" (ANC Exhs. 58, 72). According to the bare text and the drafters' intent, therefore, the plain meaning of the term "renovation" does not encompass unauthorized scavenging.

Turning to assess how the EPA's construction of renovation functions alongside other provisions of the asbestos NESHAP, we find that renovation *qua* scavenging does not comport with the regulatory regime. A quick glance at some of the notification requirements and work practice standards contained in the asbestos NESHAP makes the inconsistency clear. For example, the regulations require that the owner of a facility must supply written notice of its intent to renovate at least 10 days prior to the date of the planned renovation and that renovation shall not take place on any other date. 40 C.F.R. § 61.145(b)(1), (3). The written notice must contain the name and address of the person or persons conducting the renovation work, and must estimate the amount of asbestos that will be disturbed by the renovation. 40 C.F.R. § 61.145(b)(4). Furthermore, the rules state that a foreman trained in asbestos removal must be present at the site as the renovation is taking place. 40 C.F.R. § 61.145(c)(8). These

regulations make no sense when applied to unauthorized scavenging.[3] An owner simply is not able to notify the EPA as to when unauthorized scavenging will take place, nor can it identify the names and addresses of the scavengers, estimate how much asbestos they will disturb, or ensure that a trained foreman is present during the scavenging. The EPA's interpretation, that "renovation" includes unauthorized scavenging, would present practical impossibilities and cannot co-exist with these other provisions of the asbestos NESHAP.

Including unauthorized scavenging within the definition of "renovation" would also contravene the asbestos NESHAP's express goal of regulating owners who plan to renovate. The affirmative decision to carry out a renovation is central to the regulation. The initial asbestos NESHAP regarding renovations states that it "shall apply to any owner or operator of a ... renovation operation ... who *intends to renovate* ..." 40 Fed. Reg. at 48299 (emphasis added). An EPA publication issued in December 1990 entitled "Common Questions About the Asbestos NESHAP" (1990 Common Questions), states that an owner need not remove damaged or deteriorating asbestos-containing material from its facility "unless a renovation of the facility *is planned*" (ANC Exh 56) (emphasis added). In October 1993, the EPA issued a clarification of the asbestos NESHAP (1993 Clarification), in which it affirmed that notification and work practice requirements apply when asbestos is disturbed "as a result of a building owner's *independent decision to initiate renovation*" 58 Fed. Reg. 51784, 51784 (1993) (emphasis added). These statements indicate that the asbestos NESHAP applies to planned renovations and not to unauthorized scavenging, which, by its nature, is not activity

---

[3]Jeffrey Bratko (Bratko), the government's designated Rule 30(b)(6) witness regarding the EPA's interpretation of the term "renovation," was unable to explain how these notice- and work-practice rules could have any meaningful application in the context of unauthorized scavenging (ANC Exh. 49).

planned by the owner.

The EPA's proffered interpretation of "renovation" is further undermined by the basic structure of the asbestos NESHAP. The notice and work practice requirements of the regulations go into effect once an owner plans a renovation or demolition. Unauthorized scavenging, however, can begin once a building is vacated. Thus, the asbestos NESHAP has no applicability to buildings that are vacated but not scheduled for renovation or demolition. In the 1990 Common Questions document, the EPA was asked, "does the asbestos NESHAP require a building owner or operator to remove damaged or deteriorating asbestos containing material?" The EPA answered, "No. Not unless a renovation of the facility is planned" (ANC Exh. 56). The regulations are structured to address what happens when a building is renovated, not when it is vacated. The EPA would not have linked the applicability of the regulations to the decision to renovate if it was concerned with an activity that can (and often does) begin at a much earlier point in time. Another telling structural feature of the asbestos NESHAP involves the interplay between renovation and demolition. Under the rules, once an owner expresses its intent to demolish a facility, it can no longer proceed as if it is conducting a renovation[4] (ANC Stmt. 25(i); Govt. Resp. Stmt. 25(i)). But unauthorized scavenging obviously can occur in a building slated to be demolished. In those situations, an owner is faced with a (forced) renovation, while at the same time the rules prohibit him from acting as if a renovation is taking place. This flat inconsistency confirms that, when read in context with other provisions of the regulation, renovation cannot mean what the government says it means.

---

[4]The government correctly explains that this is because the regulations are less stringent for renovations than for demolitions.

The regulation's basic structure and provisions, along with its plain language and the drafters' intent, all press us toward the same conclusion: unauthorized scavenging does not qualify as a renovation.

Against the consistent and considerable weight of this evidence, the government props up its precarious interpretation on three words in the asbestos NESHAP, a few sentences from an agency publication, and the testimony of an EPA enforcement official. Even when given substantial deference, the government's position cannot stand. The government first relies on the language of the asbestos NESHAP itself, emphasizing that renovation means altering a facility "in any way." 40 C.F.R. § 61.141. The government draws too much from too little. The words "in any way" did not appear in prior iterations of the regulation. *See, e.g.*, 40 Fed. Reg. at 48299. They were added as part of the 1984 amendments to the asbestos NESHAP, which were expressly meant to clarify the regulations without increasing their stringency. *See* 49 Fed. Reg. at 13658, 13660; *see also* 55 Fed. Reg. at 48410 (same for 1990 amendments); Appalachian Power Co. v. E.P.A., 208 F.3d 1015, 1026-27 (D.C. Cir. 2000) (attaching significance to EPA's statement that the regulation did not impose new substantive requirements). Therefore, we can safely assume that the original understanding of the term remains valid. The government concedes this point but argues that scavenging has always come within the definition of "renovation." On the contrary, as we saw above, the EPA did not intend to include scavenging as a form of renovation even when it first promulgated the regulation in 1975. The enforcement history of the asbestos NESHAP supports this conclusion. In 25 years of regulating renovations, the EPA has never assessed a civil penalty against an

owner for unauthorized scavenging at a facility (ANC Exhs. 60, 61).[5] The EPA has enacted no regulations regarding unauthorized scavenging and has issued no rules with respect to securing vacant buildings  (ANC Exhs. 62, 70).  Scavenging in vacant buildings is not a new phenomenon (ANC Exh. 41).  The lack of enforcement speaks volumes.  In any event, common sense dictates that the words "in any way" cannot mean that the regulation applies to every possible manner by which asbestos may be disturbed.  The types of potentially governed activity are endless and, as the hypotheticals posed during depositions of EPA officials make clear,[6] approach the absurd (ANC Exh. 72).  The words "in any way" do not bolster the government's theory.

Unsaved by the language of the asbestos NESHAP, the government next points to a statement contained in an EPA background information document regarding the 1990 amendments to the regulation (1990 Background Document).   In response to a recommendation to add "salvage operations" to the definition of demolition, the EPA responded:

> The EPA realizes that the unauthorized removal of equipment for its salvage value may be a problem.  Such operations are, however, regulated under the NESHAP provisions for renovation when the threshold quantities of asbestos are exceeded.

(ANC Exh. 40).  The government argues that this statement, made in 1990, enunciated the

---

[5]The EPA can cite to only one other litigation in which it even argued that scavenging qualifies as renovation (Govt. Exhs. 29, 114, 115).  No decision was rendered in that case.  One isolated instance of litigation does not create an official agency interpretation, especially considering the internal inconsistencies and lack of support that plague that interpretation. *See* uer, 519 U.S. 462; Trident Seafoods, 60 F.3d at 559.

[6]The EPA's chief enforcement engineer and Bratko both testified that, under the government's reading of the words "in any way," the term "renovation" could include events such as unintentional fires, a broken window, or a bullet fired into the building (ANC Exh. 72).

EPA's view that unauthorized scavenging is regulated as a renovation.[7] As an initial matter, the 1990 Background Document is a guidance document; it is not an official regulation and is not published in the Federal Register. And, as noted above, the 1990 amendments did not increase the stringency of the asbestos NESHAP. 55 Fed. Reg. at 48406. Furthermore, it is unclear whether "unauthorized removal of equipment" is synonymous with unauthorized scavenging activity. The government's construction hinges on defining "unauthorized" as meaning "unauthorized by the owner of the facility." However, at other points in the 1990 Background Document, "unauthorized" is used to mean "unauthorized by the asbestos regulations" (ANC Exh. 74). If this latter definition is accurate, then "unauthorized removal of equipment" is not analogous to unauthorized scavenging.

More problematic for the government is another, clearer statement made on the very same page of the 1990 Background Document. Asked whether the definition of demolition "should also prohibit the abandonment of buildings, a major source of asbestos emissions," the EPA responded as follows:

> While EPA agrees that abandoned and vacant buildings may become emission sources, particularly where the asbestos has been disturbed by illegal scavenging operations, EPA believes that emissions from such buildings are low and has no information to the contrary. Therefore, EPA believes that including abandoned and vacant buildings in the definition of "demolition" is unwarranted at this time.

---

[7]The government makes reference to one other exchange from the 1990 Background Document, in which a commenter suggested that the definition of "renovation" "be revised to apply to nondemolition asbestos removal because many procedures involve asbestos removal but do not alter components." The EPA responded by stating that "the revised definition of 'renovation' is clear in that any stripping or removal of asbestos-containing material is covered (unless it is a demolition)" (ANC Exh. 77). As is evident from the language of the statement, and confirmed by Bratko's deposition testimony, this passage concerns the cleaning of asbestos containing components (ANC Exh. 75, 111). Scavengers enter a vacant building to take components, not to clean them of asbestos and leave them intact.

(ANC Exh. 40). Here, the EPA speaks to the issue at hand. It says that in cases involving vacant buildings, where asbestos is being disturbed by scavengers, the EPA believes that emissions are too low to regulate. Although specifically directed to the demolition of vacant buildings, this clear statement addresses the question of unauthorized scavenging in a manner that comports with the other features of the regulatory regime. Unfortunately for the government, the EPA's comments do not lend support to its interpretation of "renovation."

Other than the asbestos NESHAP's language and the statement contained in the 1990 Background Document, both of which are unhelpful to the government's cause, the government rests its argument on the testimony of Bratko, who was designated as the EPA's Rule 30(b)(6) witness regarding the meaning of the term "renovation." Bratko's testimony cannot carry the load the government places on it. According to Bratko, unauthorized scavenging is, and always has been, included in the definition of "renovation." But Bratko derives his opinion from the same regulations and documents that we have reviewed and found unpersuasive. Aside from the inconsistency between Bratko's opinion and our analysis of the asbestos NESHAP, we have serious concerns regarding whether Bratko is qualified to provide the EPA's official position on this subject. *See* <u>Ray Evers Welding Co. v. Occupational Safety and Health Review Commission</u>, 625 F.2d 726, 733 (6th Cir. 1980) (discounting testimony of unqualified OSHA witness regarding what the regulation required). Bratko admitted that he played no part in drafting the asbestos NESHAP and that he also did not participate in preparing any of the background documents or EPA publications upon which he relies (ANC Exh. 109). His position with the EPA is similar to that of an environmental engineer (ANC Exh. 99), which may place him in the category of lay person rather than expert (ANC Exh. 83).

Other EPA officials, including at least one environmental engineer and two inspectors, provided quite different opinions regarding the definition of "renovation" (ANC Exhs. 58, 83). Bratko's testimony fails to persuade, and the government's interpretation of the term falls with it.

While we are constrained to disagree with the EPA's position in this case, we are not unmindful of the environmental hazards posed by unauthorized scavenging in asbestos-tainted buildings. Nor do we disregard the laudable policy behind the CAA, which was enacted "to protect and enhance the quality of the nation's air resources." 42 U.S.C. § 7401(b)(1).[8] However, the EPA cannot enforce unforeseen interpretations of the asbestos NESHAP simply by invoking the spirit of the CAA, and is particularly forbidden from doing so for the first time in the course of a litigation. The regulated public must be informed in advance of the rules of the game.[9] *See* Alaska Professional Hunters Ass'n, Inc. v. F.A.A., 177 F.3d 1030, 1035 (D.C. Cir. 1999) (*quoting* Holmes, Holdsworth's English Law, 25 Law Quarterly Rev. 414 (1909)). Indeed, with respect to agency action, the regulated public also must have an opportunity to participate in setting those rules. That is the essence of notice and comment rulemaking. The EPA cannot escape the strictures of the notice-and-comment process by cloaking a substantive addition to the asbestos NESHAP (such as regulating scavenging) in the guise of a mere

---

[8]We also wholeheartedly apply the doctrine of judicial deference, which rightly makes courts chary to overturn an agency's interpretation of a statute, and doubly so when striking an agency's take on its own regulations. But here we encounter the rare case in which an agency has gone too far.

[9]Under the fair notice doctrine, an agency cannot assess civil penalties against a defendant unless it has provided advanced notice of its interpretation of the regulation and done so in a clear, articulable manner. *See* General Electric Co. v. E.P.A., 53 F.3d 1324, 1328-29 (D.C. Cir. 1995). The EPA's novel formulation of the term "renovation" falls short of this standard. While our holding is not based on fair notice grounds, we observe that the lack of adequate notice provides another reason to reject Counts I-III, but (assuming that the administrative order provides adequate notice) probably does not affect Count V.

interpretation of an extant regulation. Recently, the D.C. Circuit, no novice with respect to reviewing agency interpretations, chastised the EPA for that very transgression of authority. *See* Appalachian Power, 208 F.3d at 1024; *see also* Alaska Professional Hunters, 177 F.3d at 1034; Paralyzed Veterans of America v. D.C. Arena L.P., 117 F.3d 579, 586 (D.C. Cir. 1997), *cert. denied*, 523 U.S. 1003 (1998); Exportal Ltda. v. United States, 902 F.2d 45, 50 (D.C. Cir. 1990). By interpreting "renovation" to include unauthorized scavenging, the EPA attempts to broaden the scope of the asbestos NESHAP in a substantive manner without engaging in notice and comment rulemaking, and thereby violates a basic canon of administrative law. The EPA's interpretation does not pass muster even under the lenient standards that govern our review. Accordingly, we grant ANC's motion for summary judgment with respect to Counts I-III.

## III. Demolition Notice

In Count IV, the government finds fault with the notice of demolition submitted by ANC prior to razing its facility in 1995. ANC hired Brandenburg Industrial Service Corporation (Brandenburg) to complete that demolition project. Pursuant to the applicable provision of the asbestos NESHAP, 40 C.F.R. 61.145(b), Brandenburg filed a notice of demolition with the EPA and appropriate state agencies (Govt. Exh. 22). This notice was submitted on a state-approved form and substantively complied with the EPA's own guidelines regarding such notices (*id.*; ANC Exh. 69). Perhaps acknowledging the soundness of the notice, the government expressed its intentions of dropping Count IV a number of times during the course of discovery. Indeed, the government canceled depositions of witnesses relevant to Count IV and curtailed questioning of other EPA officials on the understanding

that it was "considering dropping the notice count anyway" (ANC 69, 105). Given the content

of the notice of demolition and the conduct of the government on this issue, we grant ANC's

motion for summary judgment as to Count IV.

## IV. Administrative Order

Finally, in Count V, the government alleges that ANC violated the August 8, 1994,

administrative order issued by the EPA. That administrative order was executed by both

parties and required ANC to comply with the asbestos NESHAP (*i.e.*, prevent unauthorized

scavenging that disturbs asbestos at the facility), and secure the facility from unauthorized

individuals (ANC Exh. 32). The government claims that unauthorized scavengers continued

to enter the building and disturb asbestos after August 8, 1994, and therefore alleges that ANC

breached the administrative order.[10]

It is axiomatic that the EPA must have the legal authority to regulate the conduct it

proscribes in an administrative order. *See* 42 U.S.C. § 7413(a)(3) (administrative order may

require compliance with a "requirement or prohibition" contained in the CAA or NESHAP);

SEC v. Chenery Corp., 318 U.S. 80, 95 (1943) (administrative order cannot be upheld unless

the grounds upon which agency acted in exercising its powers were those upon which its action

can be sustained). The August 8, 1994, administrative order required ANC to bar trespassers

and prevent unauthorized scavenging. However, the asbestos NESHAP (and the CAA, for that

matter) is devoid of any requirements regarding trespassers or building security (ANC Exh.

70). And, as we explained above, unauthorized scavenging also is not regulated by the asbestos

---

[10]The record indicates that ANC took considerable steps to secure the building from trespassers, but ultimately was unsuccessful in keeping scavengers out (ANC Exhs. 28, 35, 36).

laws. Thus, the EPA lacked the legal authority to require ANC to do what the administrative order required it to do. The EPA cannot now seek civil penalties against ANC for (alleged) violations of an administrative order which proscribed conduct that could not be regulated in the first place. In essence, the administrative order is powerless and ANC cannot be held liable for violating its requirements.

The government attempts to infuse the administrative order with legal force by arguing that the order is a contract which binds ANC to comply with its terms even if the EPA had no legal authority to regulate the underlying activity. The government misunderstands the nature of administrative orders. While rules of contract construction may be employed as tools of interpretation, administrative orders derive their legal power from congressional and administrative mandate and not from contract law. *See* U.S. v. ITT Continental Baking Co., 420 U.S. 223, 236 n.10 (1975); F.D.I.C. v. Frates, 44 F.Supp.2d 1176, 1199-1201 (N.D. Okla. 1999) ("[a]dministrative orders are to be complied with not because there is any meeting of the minds between the agency and the party to be bound, but because Congress has delegated certain authority to the agency and the agency's actions have the force of law."). The administrative order issued by the EPA is not a manifestation of contract law. Rather, it is a creature of federal statutory law[11] which, in this case, lacks proper foundational authority and therefore no liability can be incurred from its breach. Count V fails.

## CONCLUSION

For the reasons set forth above, ANC's motion for summary judgment is granted as to

---

[11]Indeed, the source of the administrative order's authority is expressed in the first paragraph of the document: "This Administrative Order is issued pursuant to Sections 113(a)(3) and 114(a) of the Clean Air Act" (ANC Exh. 30).

all five counts contained in the complaint.  Furthermore, ANC's motion to strike and the government's motion for summary judgment are dismissed as moot.

JAMES B. MORAN
**JAMES B. MORAN**
**Senior Judge, U. S. District Court**

July 31 , 2000.